## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BARBARA ZOTTOLA, on behalf of herself and all others similarly situated,<br><br>         Plaintiff,<br><br>    v.<br><br>EISAI INC., ARENA PHARMACEUTICALS, INC., and CVS HEALTH CO.,<br><br>         Defendants. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff Barbara Zottola ("Plaintiff") brings this action on behalf of herself and all others similarly situated against Defendants Eisai Inc. ("Eisai"), Arena Pharmaceuticals, Inc. ("Arena") and CVS Health Co. ("CVS") (collectively, "Defendants"). Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to the allegations specifically pertaining to herself, which are based on personal knowledge.

### NATURE OF THE ACTION AND FACTS COMMON TO ALL CLAIMS

1. This is a class action lawsuit regarding Defendant Eisai and Arena's manufacturing and distribution of the weight loss medications Belviq® and Belviq XR (collectively "Belviq Medications") that exposed unknowing users to a significantly elevated risk of cancer. Worse is that Defendants Eisai and Arena knew, from the early stages of research and development of these medications that they exposed users to high rates of cancer. Eisai and Arena nevertheless pushed the product to market and sold tens of millions of dollars, or more, of these defective medications to Plaintiff and Class members (defined below). That is until subsequent research further confirmed just how dangerous these medications are in terms of

causing cancer among users, leading the United States Food and Drug Administration ("FDA") to request withdrawal of Belviq® and Belviq XR from the market on February 13, 2020. By that point, unfortunately, the damage had already been done. In turn, Defendant CVS sold these defective medications to Plaintiff and Class members.

2.      Belviq® and Belviq XR are brand-name, prescription weight loss medications that contain the active ingredient lorcaserin. Lorcaserin is in a class of medications called serotonin receptor agonists. It is intended to reduce appetite by increasing feelings of fullness. This is achieved by activating a type of serotonin receptor known as the 5-HT2C receptor in the hypothalamus, a region of the brain known to control appetite. Originally developed by Arena, Belviq® was originally approved by the FDA in June 2012 as a prescription weight loss pill for obese individuals. Belviq XR is the extended release version of the product, which was approved by the FDA in July 2016.

3.      On February 13, 2020, the FDA issued a "Drug Safety Communication" about Belviq Medications stating that the FDA was requesting the withdrawal of the products from the market because the "potential risk of cancer outweighs its benefits."[1] The FDA further explained that it requested a voluntary withdrawal of Belviq Medications because "a safety clinical trial shows an increased occurrence of cancer."[2]

4.      The substantial increase in the risk of cancer when using the medication was not counterbalanced by efficacy. First, the medications are intended for weight loss, medication, and are not a life-saving medication. Not only that, but the Belviq Medications were not particularly effective anyway, achieving only about a 5% weight loss for individuals who were already

---

[1] https://www.fda.gov/drugs/drug-safety-and-availability/fda-requests-withdrawal-weight-loss-drug-belviq-belviq-xr-lorcaserin-market (last visited 3/11/20).
[2] *Id.*

obese.  Indeed, the efficacy of the products was so far outweighed by the risk of cancer that they never should have been sold in the first place.  As the FDA noted: "We are taking this action because we believe that the risks of lorcaserin outweigh its benefits based on our completed review of results from a randomized clinical trial assessing safety."[3]

5.     The FDA immediately instructed users of Belviq Medications to "stop taking lorcaserin and talk to your health care professionals about alternative weight-loss medicines and weight management programs."[4]  Users were instructed to dispose of unused medication by taking it to a drug take back location or to discard the medication.[5]  Medical professionals can no longer prescribe the medication.

6.     The FDA also published its findings as to the increased cancer risk, stating:

> When FDA approved lorcaserin in 2012, we required the drug manufacturer to conduct a randomized, double-blind, placebo-controlled clinical trial to evaluate the risk of cardiovascular problems, which found that more patients taking lorcaserin (n=462; 7.7 percent) were diagnosed with cancer compared to those taking a placebo, which is an inactive treatment (n=423; 7.1 percent). The trial was conducted in 12,000 patients over 5 years. A range of cancer types was reported, with several different types of cancers occurring more frequently in the lorcaserin group, including pancreatic, colorectal, and lung.[6]

7.     Patients like Ms. Zottola and Class members who had previously paid substantial sums of money to purchase and use these medications, which, incidentally, were not covered by most, if not all, insurance companies, suffered injury as a result of using the products.  Without insurance coverage, a one-month supply of Belviq Medications costs approximately $300.00.

8.     The dangerous nature of these medications was known to their manufacturers,

---

[3] *Id.*
[4] *Id.*
[5] *Id.*
[6] *Id.*

who knew about the cancer risk from the early stages of research and development of the medications, well before the products were brought to market. Nevertheless, Defendants Eisai and Arena pushed the products to market, minimizing and downplaying, and at times obfuscating the cancer risk, as described below.

**A. Early Research Ties Use Of Belviq To Cancer**

9.     Arena undertook a long-term carcinogenicity rat study, beginning in 2007.

10.     In early 2007, the results indicated that lorcaserin was causing rare and aggressive tumors in rats, including lethal, malignant mammary and brain tumors. Additional tumor formations included liver and thyroid, among others.

11.     Arena ultimately reported the tumor findings to the FDA. In response, the FDA requested bi-monthly updates on the rat study.

12.     By week 96 of the study, the incidence and proportion of female rats with cancerous tumors increased at every dose. This resulted in a meeting between Arena and the FDA.

13.     By week 104, however, the data began to change unexpectedly, citing a decline in malignant tumors. However, Arena could not provide the FDA with supporting data to explain the sudden shift.

14.     By February of 2009, the rat study was completed and a draft of the study was sent to the FDA. Tumor findings included mammary tumors at all doses, brain tumors, and other malignant tumors.

15.     Despite these findings, Arena pushed forward with the approval process.

**B. Belviq's Troubled Approval Process**

16.     In December 2009, the first lorcaserin New Drug Application ("NDA")

submission was sent to the FDA.

17.    In September 2010, the FDA advisory panel rejected approval of Belviq® due to safety concerns, specifically cancer risk, and because the product did not work well.[7] Specifically, the "FDA's advisory panel initially rejected Belviq® because of a risk of tumors found in animal studies."[8]  In October 2010, the FDA declined to approve the drug, consistent with the finding of the advisory panel, due to cancer promoting properties and marginal effectiveness.

18.    Despite these concerns, Arena and Eisai re-submitted the NDA for Belviq®, which was accepted by the FDA in January 2012.

19.    Relying on questionable additional studies by Arena, the FDA ultimately approved lorcaserin with restrictions, namely that it could only be used for adults with a body mass index ("BMI") greater than 30, or those with BMI of 27 or more who have at least one weight-related condition.

20.    The manufacturer was also required to conduct additional studies, including a long-term cardiovascular trial to assess the risk of Belviq® on risk for major cardiac events such as heart attack and stroke.  But, as the FDA noted in its Drug Safety Communication, this study ended up resurfacing the cancer concerns that Eisai and Arena knew about from when they began the research in 2007, as discussed above.

## C.  Belviq Medications Are Withdrawn From The Market Due To Cancer Risk

21.    On February 13, 2020, the FDA issued a "Drug Safety Communication"

---

[7] https://www.wsj.com/articles/SB10001424052748703440604575496111194567530 (last visited 3/11/20).
[8] https://www.consumerreports.org/cro/news/2013/06/weight-loss-pill-belviq-is-now-available-but-we-say-skip-it/index.htm (last visited 3/11/20)

requesting withdrawal of Belviq® and Belviq XR from the market due to "increased occurrence of cancer" in the clinical trials.

22.     The FDA stated in a news release that "clinical trials showed lorcaserin increased the risk of a number of cancers, including pancreatic, colorectal and lung."[9]

23.     Janet Woodcock, director of the FDA's Center for Drug Evaluation and Research, stated that patients should stop using the medications and talk to their health care professionals regarding a different treatment option.

24.     The FDA instructed users of the medications to return the medication to a drug return center or destroy the medication.

**D.  Plaintiff And Class Members Were Harmed By Purchasing And Consuming Defective Belviq Medications**

25.     Plaintiff and the Class were injured by the full purchase price of their Belviq® medications because the risks of the medications outweighed their benefits, and the medications should never have been sold in.  Had Defendants Eisai and Arena been forthright with the FDA regarding the animal studies conducted beginning in 2007, and the true cancer risk of the medications, the medications would never have made it to market.  However, Defendants Eisai and Arena persisted in pushing the medications to market, reaping tens of millions of dollars of profit from unsuspecting consumers.  Because of the foregoing, the medications are not fit for human consumption.  Plaintiff and members of the Class are further entitled to statutory damages and for exemplary damages related to Defendants' conduct.

26.     Plaintiff brings this action on behalf of herself and the Class for equitable relief and to recover damages and restitution for: (i) breach of the implied warranty of merchantability,

---

[9] https://www.cnn.com/2020/02/13/health/belviq-weight-loss-drug-cancer-fda/index.html (last visited 3/11/20).

(ii) violation of New York General Business Law § 349, (iii) violation of New York General Business Law § 350, (iv) unjust enrichment, (v) fraudulent concealment, (vi) fraud, and (vii) conversion.

## PARTIES

27.     Plaintiff Barbara Zottola is a citizen of New York who resides in Warwick, New York.  Plaintiff was prescribed and purchased and used Belviq®, manufactured by Eisai and Arena, on several occasions over a period of approximately two years.  Ms. Zottola filled at least one of these prescriptions at a CVS location in Warwick, New York.  When purchasing Belviq® from Defendants, Ms. Zottola reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturers and pharmacy that the medications were properly manufactured, free from defects, and safe for their intended use.  Ms. Zottola relied on these representations and warranties in deciding to purchase Belviq® from Defendants, and these representations and warranties were part of the basis of the bargain, in that she would not have purchased Belviq® from Defendants if she had known that it was not, in fact, properly manufactured, free from defects, and safe for its intended use.  Ms. Zottola also understood that in making the sales, CVS was acting with the knowledge and approval of Eisai and Arena and/or as the agents of Eisai and Arena.  Ms. Zottola also understood that each purchase involved a direct transaction between herself and Eisai and Arena because her medication came with packaging and other materials prepared by Eisai and Arena, including representations and warranties that her medications were properly manufactured and free from defects.  Defendants did not disclose the dangers of the product to Plaintiff, nor did they advise Plaintiff that the product was withdrawn from the market.

28.     Defendant Eisai Inc. is a corporation organized under the laws of Delaware with a

principal place of business at 100 Tice Boulevard, Woodcliff Lake, New Jersey 07677. Eisai

Inc. is a wholly owned subsidiary of Eisai Co., Ltd. Eisai conducts substantial business in the

United States, and specifically in the State of New York. Eisai has been engaged in the

manufacturing, distribution, and sale of defective Belviq® and Belviq XR in the United States,

including in the State of New York.

29.    Defendant Arena Pharmaceuticals, Inc. is a corporation organized under the laws

of Delaware with a principal place of business at 6154 Nancy Ridge Drive, San Diego,

California 92121. Arena conducts substantial business in the United States, and specifically in

the State of New York. Arena has been engaged in the manufacturing, distribution, and sale of

defective Belviq® and Belviq XR in the United States, including in the State of New York.

30.    Defendant CVS Health Co. is a corporation organized under the laws of the State

of Rhode Island and Providence Plantations and maintains its principal place of business at One

CVS Drive, Woonsocket, Rhode Island 02895. Among other services, CVS provides pharmacy

services. Defendant CVS conducts substantial business throughout the United States, and

specifically in the State of New York. Plaintiff purchased Belviq® from a CVS in Warwick,

New York.

## JURISDICTION AND VENUE

31.    The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A),

as modified by the Class Action Fairness Act of 2005, because at least one member of the Class,

as defined below, is a citizen of a different state than Defendants, there are more than 100

members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of

interest and costs.

32.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because many of the

acts and transactions giving rise to this action occurred in this District, and because Defendants (a) are authorized to conduct business in this District and have intentionally availed themselves of the laws and markets within this District through the promotion, marketing, distribution, and sale of defective Belviq® and Belviq XR in this District; (b) conduct substantial business in this District; and (c) are subject to personal jurisdiction in this District.

<u>**CLASS ALLEGATIONS**</u>

33.     Plaintiff seeks to represent a class defined as all persons in the United States who purchased Belviq® or Belviq XR (the "Class").

34.     Specifically excluded from the Class are persons who made such purchase for the purpose of resale, Defendants, Defendants' officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or Defendants' officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

35.     Plaintiff also seeks to represent a subclass of all Class members who purchased Belviq® or Belviq XR in New York (the "New York Subclass").

36.     Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class and New York Subclass may be expanded or narrowed by amendment or amended complaint.  The Class and New York Subclass are collectively referred to as the "Classes."

37.     **Numerosity.**  The members of the Class are geographically dispersed throughout the United States and are so numerous that individual joinder is impracticable.  Upon information and belief, Plaintiff reasonably estimates that there are hundreds of thousands of

members in the Class, and tens of thousands of members in the New York Subclass. Although the precise number of Class and New York Subclass members is unknown to Plaintiff, the true number of Class and New York Subclass members is known by Defendants and may be determined through discovery. Class and New York Subclass members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendants and third-party retailers and vendors.

38.    **Existence and predominance of common questions of law and fact.** Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting only individual Class and New York Subclass members. These common legal and factual questions include, but are not limited to, the following:

(a)    whether the Belviq Medications manufactured, distributed, and sold by Defendants exposed users to high rates of cancer and were unfit for use as medications, thereby breaching implied warranties made by Defendants and making Belviq Medications unfit for human consumption and therefore unfit for their intended purpose;

(b)    whether Defendants knew or should have known that the Belviq Medications exposed users to high rates of cancer prior to selling the medication, thereby constituting fraud and/or fraudulent concealment;

(c)    whether Defendants have unlawfully converted money from Plaintiff and the Class and New York Subclass;

(d)    whether Defendants are liable to Plaintiff and the Class and New York Subclass for unjust enrichment;

(e)    whether Defendants are liable to Plaintiff and the Class and New York Subclass for fraudulent concealment;

(f)     whether Defendants are liable to Plaintiff and the New York Subclass for violations of the New York consumer-protection law;

(g)     whether Defendants are liable to Plaintiff and the Class and New York Subclass for breaches of express and implied warranties;

(h)     whether Plaintiff and the Class and New York Subclass have sustained monetary loss and the proper measure of that loss;

(i)     whether Plaintiff and the Class and New York Subclass are entitled to declaratory and injunctive relief;

(j)     whether Plaintiff and the Class and New York Subclass are entitled to restitution and disgorgement from Defendants; and

(k)     whether the marketing, advertising, packaging, labeling, and other promotional materials for Belviq Medications are deceptive.

39.     **Typicality.**  Plaintiff's claims are typical of the claims of the other members of the Class and New York Subclass in that Defendants mass marketed and sold defective Belviq Medications to consumers throughout the United States.  This defect was present in all of the Belviq Medications manufactured, distributed, and sold by Defendants.  Therefore, Defendants breached their implied warranties to Plaintiff and Class and New York Subclass members by manufacturing, distributing, and selling the defective Belviq Medications.  Plaintiff's claims are typical in that she was uniformly harmed in purchasing and consuming defective Belviq Medication.  Plaintiff's claims are further typical in that Defendants deceived Plaintiff in the very same manner as they deceived each member of the Class and New York Subclass.  Further, there are no defenses available to Defendants that are unique to Plaintiff.

40.     **Adequacy of Representation.**  Plaintiff will fairly and adequately protect the

interests of the Class and New York Subclass.  Plaintiff has retained counsel that is highly experienced in complex consumer class action litigation, and Plaintiff intends to vigorously prosecute this action on behalf of the Class and New York Subclass.  Furthermore, Plaintiff has no interests that are antagonistic to those of the Class and New York Subclass.

41.    **Superiority.**    A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class and New York Subclass members are relatively small compared to the burden and expense of individual litigation of their claims against Defendants.  It would, thus, be virtually impossible for the Class and New York Subclass, on an individual basis, to obtain effective redress for the wrongs committed against them.  Furthermore, even if Class and New York Subclass members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

42.    In the alternative, the Class and New York Subclass may also be certified because:

(a)    the prosecution of separate actions by individual Class and New York Subclass members would create a risk of inconsistent or varying adjudications with respect to individual Class and New York Subclass members that would establish incompatible standards of conduct for the Defendants;

(b)      the prosecution of separate actions by individual Class and New York Subclass members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class and New York Subclass members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

(c)      Defendants have acted or refused to act on grounds generally applicable to the Class and New York Subclass as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class and New York Subclass as a whole.

### COUNT I
### Breach Of The Implied Warranty Of Merchantability
### (On Behalf Of The Class And New York Subclass)

43.      Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

44.      Plaintiff brings this claim individually and on behalf of the members of the proposed Class and the New York Subclass against Defendants.

45.      Defendants, as the designers, manufacturers, marketers, distributors, and/or sellers, impliedly warranted that the Belviq Medications were (i) fit for use as weight loss medications, and (ii) generally recognized as safe for human consumption.

46.      Defendants breached the warranty implied in the contract for the sale of the defective Belviq Medications because they could not pass without objection in the trade under the contract description, the Belviq Medications were not of fair or average quality within the description, and the Belviq Medications were unfit for their intended and ordinary purpose because the Belviq Medications manufactured, distributed, and sold by Defendants were defective in that they are carcinogenic and not fit for use as a weight loss medication, and as such

are not generally recognized as safe for human consumption. The fact that Defendants ceased manufacturing and distributing the medications at the request of the FDA, and instructed users to stop using and destroy the medications, shows that they are unmerchantable and unfit for human use. As a result, Plaintiff and Class and New York Subclass members did not receive the goods as impliedly warranted by Defendants to be merchantable.

47.     Plaintiff and Class and New York Subclass members purchased Belviq Medications in reliance upon Defendants' skill and judgment and the implied warranties of merchantability and fitness for the purpose.

48.     The Belviq Medications were not altered by Plaintiff or Class and New York Subclass members.

49.     The Belviq Medications were defective when they left the exclusive control of Defendants.

50.     Defendants knew that the Belviq Medications would be purchased and used without additional testing by Plaintiff and Class and New York Subclass members.

51.     The defective Belviq Medications were defectively manufactured and unfit for their intended purpose, and Plaintiff and Class and New York Subclass members did not receive the goods as warranted.

52.     As a direct and proximate cause of Defendants' breach of the implied warranty, Plaintiff and Class and New York Subclass members have been injured and harmed because: (a) they would not have purchased Belviq Medications if they knew the medications caused a significantly elevated risk of cancer and that the medications are not generally recognized as safe for human consumption; and (b) the Belviq Medications do not have the characteristics, ingredients, uses, or benefits as promised by Defendants. Plaintiff and members of the Class and

New York Subclass would have used a different medication, or other mechanisms for weight control had they known the truth about Belviq Medications.

53.     On March 11, 2020, Plaintiff provided Defendants with timely notice of this claim by letter that complied in all respects with U.C.C. § 2-607(3)(a).  The March 11, 2020 letter is attached hereto as **Exhibit A**.

<u>COUNT II</u>
**Violation Of New York General Business Law § 349**
**(On Behalf Of The New York Subclass)**

54.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

55.     Plaintiff brings this claim individually and on behalf of the members of the proposed New York Subclass against Defendants.

56.     New York's General Business Law § 349 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce.

57.     In its sale of goods throughout the State of New York, Defendants conduct business and trade within the meaning and intendment of New York's General Business Law § 349.

58.     Plaintiff and members of the New York Subclass are consumers who purchased products from Defendants for their personal use.

59.     By the acts and conduct alleged herein, Defendants have engaged in deceptive, unfair, and misleading acts and practices, which include, without limitation, misrepresenting that Belviq Medications (i) were fit for use as a weight loss medications when in fact it caused a significantly elevated risk of cancer, warranting withdrawal from the market and an instruction to purchasers and users of the products to destroy the medication, and (ii) are generally recognized

as safe for human consumption.

60.     The foregoing deceptive acts and practices were directed at consumers.

61.     The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the characteristics and quality of Belviq Medications to induce consumers to purchase the same.

62.     By reason of this conduct, Defendants engaged in deceptive conduct in violation of New York's General Business Law.

63.     Defendants' actions are the direct, foreseeable, and proximate cause of the damages that Plaintiff and members of the New York Subclass have sustained from having paid for and used Defendants' products.

64.     As a result of Defendants' violations, Plaintiff and members of the New York Subclass have suffered damages because: (a) they would not have purchased Belviq Medications if they knew the medications caused cancer and were unfit for use as a weight loss medications; and (b) Belviq Medications do not have the characteristics, uses, benefits, or qualities as promised.

65.     On behalf of herself and other members of the New York Subclass, Plaintiff seeks to recover her actual damages or fifty dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

## COUNT III
### Violation Of New York General Business Law § 350
### (On Behalf Of The New York Subclass)

66.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

67.     Plaintiff brings this claim individually and on behalf of the members of the

proposed New York Subclass against Defendants.

68.    New York's General Business Law § 350 prohibits false advertising in the conduct of any business, trade, or commerce.

69.    Pursuant to said statute, false advertising is defined as "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect."

70.    Based on the foregoing, Defendants have engaged in consumer-oriented conduct that is deceptive or misleading in a material way which constitutes false advertising in violation of Section 350 of New York's General Business Law.  Specifically, Defendants advertised Belviq Medications as safe and effective medications for weight loss, when in fact Defendants actively misrepresented the true nature of the medications to consumers.

71.    Defendants' false, misleading, and deceptive statements and representations of fact were and are directed towards consumers.

72.    Defendants' false, misleading, and deceptive statements and representations of fact were and are likely to mislead a reasonable consumer acting reasonably under the circumstances.

73.    Defendants' false, misleading, and deceptive statements and representations of fact have resulted in consumer injury or harm to the public interest.

74.    As a result of Defendants' false, misleading, and deceptive statements and representations of fact, Plaintiff and the New York Subclass have suffered and continue to suffer economic injury.

75.    As a result of Defendants' violations, Plaintiff and members of the New York Subclass have suffered damages due to said violations because: (a) they would not have purchased Belviq Medications if they knew the medications caused a significantly elevated risk

of cancer and that they are not safe for human consumption; and (b) Belviq Medications do not have the characteristics, uses, benefits, or qualities as promised.

76.     On behalf of herself and other members of the New York Subclass, Plaintiff seeks to recover her actual damages or five hundred dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

## COUNT IV
### Unjust Enrichment
### (On Behalf Of The Class And New York Subclass)

77.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

78.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class and New York Subclass against Defendants.

79.     Plaintiff and the Class and New York Subclass conferred a benefit on Defendants in the form of monies paid to purchase Defendants' defective Belviq Medications.

80.     Defendants voluntarily accepted and retained this benefit.

81.     Because this benefit was obtained unlawfully, namely by selling and accepting compensation for medications unfit for human use, it would be unjust and inequitable for the Defendants to retain it without paying the value thereof.

## COUNT V
### Fraudulent Concealment
### (On Behalf Of The Class and New York Subclass)

82.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

83.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class and New York Subclass against Defendants.

84.     Defendants had a duty to disclose material facts to Plaintiff and the Class and New York Subclass given their relationship as contracting parties and intended users of Belviq Medications.  Defendants also had a duty to disclose material facts to Plaintiff and the Class and New York Subclass, namely that they were in fact manufacturing, distributing, and selling harmful Belviq Medications unfit for human consumption, because Defendants had superior knowledge such that the transactions without the disclosure were rendered inherently unfair.

85.     Defendants possessed knowledge of these material facts.  As set forth at length, above, Defendants had knowledge of the fact that Belviq Medications caused high rates of cancer from the earliest clinical trials of the medication.  Defendants nevertheless actively concealed this fact and doctored testing results to the FDA to get the product approved. Defendants failed to disclose or actively obscured the true nature of the medication from the FDA, prescribing physicians, and consumers.  Defendants did so until FDA-mandated testing revealed the true nature of the products, warranting their immediate withdrawal from the market.

86.     Defendants failed to discharge their duty to disclose these materials facts.

87.     In so failing to disclose these material facts to Plaintiff and the Class and New York Subclass, Defendants intended to hide from Plaintiff and the Class and New York Subclass that they were purchasing and consuming Belviq Medications with harmful defects that rendered the medications unfit for human use, and thus acted with scienter and/or an intent to defraud.

88.     Plaintiff and the Class and New York Subclass reasonably relied on Defendants' failure to disclose insofar as they would not have purchased the defective Belviq Medications manufactured, distributed, and sold by Defendants had they known the true nature of the medications.

89.     As a direct and proximate cause of Defendants' fraudulent concealment, Plaintiff

and the Class and New York Subclass suffered damages in the amount of monies paid for the defective Belviq Medications.

90.     As a result of Defendants' willful and malicious conduct, punitive damages are warranted.

## COUNT VI
**Fraud**
**(On Behalf Of The Class and New York Subclass)**

91.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

92.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class and New York Subclass against Defendants.

93.     As discussed above, Defendants provided Plaintiff and Class and New York Subclass members with materially false or misleading information about the Belviq Medications manufactured, distributed, and sold by Defendants.  Specifically, Defendants had knowledge of the fact that Belviq Medications caused high rates of cancer from the earliest clinical trials of the medication.  Defendants nevertheless actively represented to consumers that the medications were safe for use.  Defendants did so until FDA-mandated testing revealed the true nature of the products, warranting their immediate withdrawal from the market.

94.     The misrepresentations and omissions of material fact made by Defendants, upon which Plaintiff and Class and New York Subclass members reasonably and justifiably relied, were intended to induce and actually induced Plaintiff and Class and New York Subclass members to purchase defective Belviq Medications.

95.     Defendants knew that Belviq Medications were unsafe and unfit for use, but continued to manufacture them nonetheless.

96.     The fraudulent actions of Defendants caused damage to Plaintiff and Class and New York Subclass members, who are entitled to damages and other legal and equitable relief as a result.

97.     As a result of Defendants' willful and malicious conduct, punitive damages are warranted.

**COUNT VII**
**Conversion**
**(On Behalf Of The Class And New York Subclass)**

98.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

99.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class and New York Subclass against Defendants.

100.    Plaintiff and the Class and New York Subclass have an ownership right to the monies paid for the defective Belviq Medications manufactured, distributed, and sold by Defendants.

101.    Defendants have wrongly asserted dominion over the payments illegally diverted to them for the defective Belviq Medications.  Defendants have done so every time that Plaintiff and the Class and New York Subclass bought Belviq Medications.

102.    As a direct and proximate cause of Defendants' conversion, Plaintiff and the Class and New York Subclass suffered damages in the amount of the payments made for each time they bought Belviq Medications.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

21

A.      For an order certifying the nationwide Class and the New York Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and New York Subclass and Plaintiff's attorneys as Class Counsel to represent the Class and members of the New York Subclass;

B.      For an order declaring the Defendants' conduct violates the statutes referenced herein;

C.      For an order finding in favor of Plaintiff, the nationwide Class, and the New York Subclass on all counts asserted herein;

D.      For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

E.      For prejudgment interest on all amounts awarded;

F.      For an order of restitution and all other forms of equitable monetary relief;

G.      For injunctive relief as pleaded or as the Court may deem proper; and

H.      For an order awarding Plaintiff and the Class and New York Subclass their reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.


Dated:  March 27, 2020            Respectfully submitted,


**BURSOR & FISHER, P.A.**

By:    _/s/ Andrew J. Obergfell_
         Andrew J. Obergfell

Andrew J. Obergfell
Joseph I. Marchese
888 Seventh Avenue
New York, NY 10019
Telephone: (212) 837-7150
Facsimile:  (212) 989-9163

Email:  aobergfell@bursor.com
          jmarchese@bursor.com

**BURSOR & FISHER, P.A.**
Sarah N. Westcot (*pro hac vice* forthcoming)
2665 S. Bayshore Drive, Suite 220
Miami, FL 33133
Telephone: (305) 330-5512
Facsimile:  (305) 676-9006
E-Mail:   swestcot@bursor.com

*Attorneys for Plaintiff*

# EXHIBIT A

# BURSOR & FISHER

P.A.

888 SEVENTH AVENUE
3ᴿᴰ FLOOR
NEW YORK, NY 10019
www.bursor.com

ANDREW J. OBERGFELL
Tel: 646.837.7129
Fax: 212.989.9163
aobergfell@bursor.com

March 11, 2020

**_Via Certified Mail – Return Receipt Requested_**

Eisai Inc.
100 Tice Boulevard
Woodcliff Lake, New Jersey 07677

Arena Pharmaceuticals, Inc.
6154 Nancy Ridge Drive
San Diego, California 92121

CVS Health Co.
One CVS Drive
Woonsocket, Rhode Island 02895

Re:    *Notice and Demand Letter Pursuant to U.C.C. § 2-607;*
       *New York's General Business Law §§ 349-350; and*
       *all other relevant state and local laws*

To Whom It May Concern:

        This letter serves as a preliminary notice and demand for corrective action by Eisai Inc. ("Eisai"), Arena Pharmaceuticals, Inc. ("Arena") and CVS Health Co. ("CVS") pursuant to U.C.C. § 2-607(3)(a) concerning breaches of express and implied warranties – and violations of state consumer protection laws – related to our client, Barbara Zottola, and a class of all similarly situated purchasers (the "Class") of defective Belviq® and Belviq XR manufactured and distributed by Eisai and Arena, and sold by CVS.

        Ms. Zottola purchased Belviq, which is manufactured and distributed by Eisai and Arena, and sold by CVS.  Ms. Zottola's medication was defective in that Arena and Eisai exposed unknowing users to a significantly elevated risk of cancer.  On February 13, 2020, The U.S. Food & Drug Administration ("FDA") announced that it requested withdrawal of Belviq and Belviq XR from the market "because a safety clinical trial show[ed] an increased occurrence of cancer."  The FDA further concluded that the "risks of lorcaserin outweigh its benefits."  The FDA instructed users to "stop taking lorcaserin and talk to your health care professionals about alternative weight-loss medicines and weight management programs," and dispose of unused product.  Neither Plaintiff nor Class members received a refund for the product.  In short, the Belviq® and Belviq XR medications that our client and the Class were purchasing are worthless, as they were and are unusable and unfit for human consumption.  Eisai, Arena and CVS each

1

**BURSOR&FISHER**
P.A.

violated express and implied warranties made to our client and the Class regarding the quality and safety of the Belviq® and Belviq XR they purchased.  *See* U.C.C. §§ 2-313, 2-314.

Additionally, this letter also serves as notice of violation of New York General Business Law §§ 349 and 350, and all other relevant state and local laws.  As a result of Eisai, Arena and CVS's violation of New York General Business Law § 349 and § 350, Ms. Zottola and Class members sustained injury.

On behalf of our client and the Class, we hereby demand that Eisai, Arena and CVS immediately (1) undergo a corrective advertising campaign to notify consumers of the wrongs detailed herein, and (2) make full restitution to all purchasers of the defective Belviq® and Belviq XR medications of all purchase money obtained from sales thereof.

We also demand that Eisai, Arena and CVS preserve all documents and other evidence which refers or relates to any of the above-described practices including, but not limited to, the following:

1.  All documents concerning the packaging, labeling, and manufacturing process for Belviq® and Belviq XR;

2.  All documents concerning the design, development, supply, production, extraction, and/or testing of Belviq® and Belviq XR;

3.  All tests of Belviq® and Belviq XR;

4.  All documents concerning the pricing, advertising, marketing, and/or sale of Belviq® and Belviq XR;

5.  All communications with customers involving complaints or comments concerning Belviq® and Belviq XR;

6.  All documents concerning communications with any retailer involved in the marketing or sale of Belviq® and Belviq XR;

7.  All documents concerning communications with federal or state regulators; and

8.  All documents concerning the total revenue derived from sales of Belviq® and Belviq XR.

If you contend that any statement in this letter is inaccurate in any respect, please provide us with your contentions and supporting documents immediately upon receipt of this letter.

Please contact me right away if you wish to discuss an appropriate way to remedy this matter.  If I do not hear from you promptly, I will take that as an indication that you are not interested in doing so.

BURSOR&FISHER
P.A.

Very truly yours,

*Andrew J. Obergfell*

Andrew J. Obergfell